# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| | |
|---|---|
| United States of America<br>v.<br>Armando Arnoldo Martinez, Juan Carlos Martinez-Tinoco, and Luis Enrique Flores,<br><br>*Defendant(s)* | )<br>)<br>)   Case No. 1:15-mj-00157 SAB<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __October 15 and 16, 2015__ in the county of __Tulare__ in the __Eastern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1), 841(b)(1)(A), 846 | 1) Conspiracy to Manufacture, to Distribute and to Possess With Intent to Distribute 1,000 or More Marijuana Plants, a Schedule I controlled substance, in violation of Title 21, United States Code, Section(s) 841(a)(1), 841 (b)(1)(A) and 846; Penalty: Mandatory minimum prison term of 10 years, maximum prison term of life/fine of up to $10 million; |
| 18 USC 1361 | (2) Depredation of Government Property with Damage Exceeding $1,000; Penalty: Maximum prison term of 10 years/fine of up to $250,000 or twice the gross loss |

This criminal complaint is based on these facts:

See Attached Affidavit, which is incorporated herein by reference.

☑ Continued on the attached sheet.

☑ Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Fed.R.Crim. P. 4.1

*Complainant's signature*

Brian Adams, Special Agent, US Forest Service
*Printed name and title*

☐ Sworn to before me and signed in my presence.

Date: **Oct 16, 2015**

*Judge's signature*

City and state: __Fresno, California__   Stanley A. Boone, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANTS

I, Brian Adams, being duly sworn, hereby state and depose:

## I.

## AFFIANT'S CREDENTIALS

1. I am a Special Agent with the United States Forest Service (USFS), stationed on the Sequoia National Forest. I have been employed by the USFS since April of 1986 and was a uniformed Law Enforcement Officer from 1992 to 2008. In May of 2008, I became a Special Agent. I am a graduate of both the Land Management Police Training Program and the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I also have the arrest powers of a California State Peace Officer, pursuant to Sections 830.8 (a) and (b) of the California Penal Code, and have completed the training required by the State of California, pursuant to Penal Code Section 832. My primary duties include detecting, investigating, apprehending, and prosecuting criminal activity associated with controlled substance production and use on and relating to National Forest System lands. I have been both the lead and assisting investigator in numerous controlled substance investigations and have arrested/cited hundreds of persons for possession, manufacturing, transportation and sales of various controlled substances and illegal drug paraphernalia. While employed as a LEO/Special Agent I have investigated over 600 large scale outdoor marijuana grow sites on federal, state and private lands. The grow sites have been in various stages of production. As a result of investigating these grow sites, I have become very familiar with methods used by the growers to locate, set up, cultivate, harvest and conceal the marijuana grow sites. I have also become very familiar with methods used to re-supply the grow sites and remove harvested marijuana from the mountains. As a result of these investigations, I have learned that the primary means of communication between the growers and the upper-levels of their organization is by cellular telephone. During the course of these investigations, I have had the opportunity to interview subjects involved in and cultivating and

transporting marijuana. During these conversations, I have discussed methods used to grow marijuana, evade detection, communicate with upper-levels of their organization, and transport marijuana and supplies on National Forest lands. I have also observed subjects dropping off supplies and personnel to gardens and have observed processed marijuana being removed by vehicle from the grow site areas. In 2002, I attended the DEA Aerial Cannabis Observation School and have spotted numerous marijuana gardens by air. I have 23 years of on-the-job training and experience in tracking people through the mountains in a variety of conditions and situations. I have used these skills in search and rescue situations and to detect and track marijuana growers on numerous occasions. I have received over 300 hours of formal training relating to the enforcement of controlled substance laws. This training has been provided to me by the Kern, Fresno and Tulare County Sheriffs' Departments, U.S. Drug Enforcement Administration (DEA), California Highway Patrol, California Narcotics Officers' Association (CNOA), California Department of Justice, the USFS, and private organizations. I have been a member of CNOA since 2004. I am a trained Drug Recognition Expert and have made numerous arrests for subjects being under the influence of and driving under the influence of various controlled substances. I am also responsible for investigating other crimes that occur on USFS land, including arson, resource and property damage and theft. I am a trained wildfire origin and cause investigator and have also attended advanced fire investigation courses. I have investigated over 50 fires on USFS, Bureau of Land Management (BLM) and private lands during my career, including fires that have exceeded 50,000 acres in size.

2. During my career, I have conducted or participated in controlled substance investigations, including conspiracies to manufacture, distribute and possess with intent to distribute controlled substances (21 U.S.C. Sections 841(a)(1) and 846) and the manufacture, distribution and possession of controlled substances with the intent to distribute (21 U.S.C. Section 841(a) (1)). These investigations targeted drug trafficking organizations primarily engaged in the sale, manufacture, importation and distribution of marijuana, which in some instances, also involved cocaine, methamphetamine and other controlled substances. During the course of my work, I have had the opportunity to converse with numerous Law Enforcement

Officers and drug enforcement officers, informants, as well as admitted and known drug traffickers as to the methods, regarding the manufacture, importation, transportation, distribution and sales of controlled substances. I have been the affiant on both federal and state search and arrest warrants and have testified in both state and federal court in the area of narcotics.

3. Through prior investigating and training, I have become familiar with the types and amounts of profits made by drug dealers and the methods, language and terms that are used. I am familiar and have participated in various investigative methods including, but not limited to, visual surveillance, interviewing of witnesses, search warrants and use of confidential informants. I have worked joint investigations with various experienced Law Enforcement Officers who are trained in narcotics investigations and I have drawn from their knowledge and expertise in the field of narcotics enforcement.

4. My awareness of these drug trafficking practices, as well as my knowledge of drug manufacturing and distribution techniques as set forth in this Affidavit, arise from the following:

(a) my training in controlled substance investigations;

(b) my past experience in outdoor marijuana garden investigations;

(c) my involvement in this drug investigation

(d) what other experienced drug agents have advised me when relating the substance of debriefings of confidential informants and cooperating individuals in prior drug investigations and the results of their own drug investigations; and

(e) other information provided through law enforcement channels.

Based upon this knowledge and experience, I state the following:

II

**NATURE OF AFFIDAVIT**

5. This affidavit is submitted in support of a criminal complaint and application for issuance of arrest warrants for **Armando Arnoldo Martinez, Juan Carlos Martinez-Tinoco,** and **Luis Enrique Flores.** Based upon your affiant's training, experience and conversations with other law enforcement officers, I believe there is probable cause to find that the

aforementioned individuals conspired to manufacture, to distribute and to possess with intent to distribute 1,000 or more marijuana plants, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a) (1), 841(b) (1) (A) and 846, and committed the depredation of government property with damage in excess of $1,000.00, in violation of Title 18, United States Code, Section 1361.

6. The facts set forth in this affidavit are based on my training and experience and information obtained from other witnesses and Law Enforcement Officers, including incident reports. This affidavit is intended to show that there is sufficient probable cause for the requested complaint and arrest warrants and does not purport to set forth all of my knowledge of, or the investigation into, this matter.

### III.

### STATEMENT OF PROBABLE CAUSE

7. On October 14, 2015, at 2:30 p.m.,[1] I was conducting roadside reconnaissance along the Lloyd Meadow Road in the area of a landmark known as The Needles in the Sequoia National Forest in Tulare County. At the approximate GPS coordinates of N 36 06.726 W 118 28.006, I located a heavily-used trail leading uphill to the west. I am very familiar with the area and I know there are no developed or maintained trails in that area and I have never seen that particular trail in my 33 years working in the area. I walked approximately two hundred yards up the trail and located small bits of plastic bags along the trail. I also found a heavily-trampled area just west of the road. Based on my training and experience, I identified the trail as being consistent in appearance with hundreds of access trails used by marijuana growers to hike to their clandestine grow sites. The trampled down area appeared to be a "lay-up" where growers hide and wait for the supply vehicle to arrive. I was alone so I did not hike any further up the trail.

8. On October 15, 2015, at 9:45 a.m., I returned to the area with USFS Special Agent B. Smith and California Department of Fish and Wildlife (DFW) Warden K. Shaw to hike up the trail to confirm that it led to a marijuana grow site. We began hiking and, after walking for

---

[1] Any and all references herein to dates, times, and drug quantities are to approximate dates, times and drug quantities.

approximately one-half mile, we came to an area where I saw harvested marijuana plants growing among native manzanita bushes and black water plastic lines running in rows along the hillside. We did not see any footprints on the trail or in the grow site and I suspected that the site might have already been harvested.

9. We entered the grow site and, after walking for approximately 75 yards, we came to an area where I saw numerous marijuana plants growing. Some of the plants had been topped, but most were still intact and growing. As we continued through the grow site, Warden Smith yelled "Runners!" and I saw subjects running up a steep hillside in the opposite direction. As I ran after them, I saw a large campsite hidden in the trees with numerous tents and tarped areas. I stopped to make sure there were no armed suspects in the camp, and then continued after the closest subject. Warden Shaw was closer to the subject than I was, but I could see him running through the trees. The subjects had too much of a head start on us and we soon lost sight of them. We were getting separated from each other, so I called off the search for officer safety reasons.

10. We returned to the camp and discovered a large marijuana processing area adjacent to three tents. There were at least 200 marijuana plants hanging in one area and two large racks containing manicured marijuana buds. We cleared the tents for suspects by pulling out sleeping bags and did not find any suspects in the tents. I found a light-colored backpack on the ground adjacent to one of the tents. In the pack, I found clothing and a black iPhone. I seized the phone as evidence. Under one of the tarps, I found a black backpack that contained clothing and a white Samsung Galaxy 2 cell phone. The tarp was just used as a roof to protect the kitchen area from rain. All sides of the tarped area were open and no attempt was made to close-off the area or make it private. I seized the phone as evidence.

---

[1] Any and all references herein to dates, times, and drug quantities are to approximate dates, times and drug quantities.

11. We cleared the grow site and located six separate plots of marijuana plants. Three of the plots had not been harvested yet and the others were partially harvested. Another camp and kitchen area were located at the west edge of the grow site. I seized approximately 10 pounds of processed marijuana and several green plants as evidence. The remainder of the processed marijuana was destroyed by submerging it in a reservoir and covering it with dirt. All clothing, food and sleeping bags were also made unusable in the same manner. Based on the size of the camps, it appeared that six or more people were living there. Photographs were taken of the area. We left the grow site by the same trail and did not encounter any suspects. Other items of evidence were collected, including wrappers of various items found in the main camp.

12. A plan was made to return to the camp on October 16, 2015. As I was en route to the area, I received a radio call from USFS Officer J. Norris who reported that a citizen had contacted him to report suspicious activity. The citizen reported seeing three Hispanic male subjects sitting near his gate on the Lloyd Meadow Road at 7:00 a.m. This area is approximately a six hour walk from the grow site. The subjects were described as being wet and dirty. The subjects did not have any camping gear or backpacks with them. The subjects asked the citizen for assistance. The three subjects were given a ride to Sierra Gateway Market in Kernville and dropped off. The citizen reported that the subjects purchased new clothing and other items. The citizen said two of the subjects were older and spoke only Spanish and one of the subjects was younger and spoke English. One of the subjects was reported to be named "Luis." I responded to the store and was advised by the clerk that three subjects matching that description were dropped off at the store by a man who said he found them in the mountains. The store clerk said the subjects walked south from the store after purchasing the items and he lost sight of them. The clerk said they bought tourist-type clothing that said "Kern River" on the shirts.

13. I began checking the roads, restaurants and motels in the area looking for the three subjects. I contacted the desk clerk of the Pine Cone Inn and she advised me that three subjects matching that description had just checked into room two. After calling for assistance, I knocked on the door of Room Two. A younger Hispanic male, later identified verbally by the male as **Luis Enrique Flores,** opened the door. **Flores** was wearing a blue shirt that said "Kern River"

on the front. I asked **Flores** if he had been in the mountains and he said yes. I could smell the odor of campfire smoke emanating from **Flores**. I asked the man what he was doing and he said camping near a very large rock. I could see no camping gear in the room and was previously advised by the reporting citizen that the three men had no gear with them when he encountered them. It was very cold and rainy in the mountains on the previous day and night and it would have been difficult and dangerous to be camping in that environment with no equipment. I told the man I knew he was in a marijuana grow and that he had run from me and other officers on the previous day. **Flores** denied the accusation. I could see another, older man, later identified by a Mexican identification card as **Juan Carlos Martinez-Tinoco** sitting on a bed in the room. The man was very similar in appearance to the man Warden Shaw and I had chased on the previous day. I told **Juan Martinez** I recognized him from the marijuana grow when he ran from me and he nervously denied he was there. I asked where the third subject was and both **Flores** and **Juan Martinez** said he was in the shower. Both **Flores** and **Juan Martinez** were looking nervously at each other and **Flores** was laughing nervously when I mentioned the marijuana grow site. I asked the **Flores** if he would step outside of the hotel room and talk to me and he complied. **Flores** continued to deny being in a marijuana grow. I told **Flores** I was handcuffing him for my safety and placed him in handcuffs. I then asked **Flores** and **Juan Martinez** if I could enter the room and I was told I could enter. I had **Flores** lay on the bed and asked **Juan Martinez** to stay seated. I told both men they were not under arrest, but **Flores** was handcuffed for my safety. I told **Flores** I would take off the handcuffs when additional units arrived on scene. The third man came out of the shower approximately five minutes later and I asked him to sit in a chair. The man complied. The third man identified himself as **Armando Arnoldo Martinez.** I told **Armando Martinez** he was not under arrest. All three subjects kept trying to make statements to me but I told them not to talk at that time. Additional units arrived several minutes later and I took the handcuffs off of **Flores.** Warden Shaw arrived on scene and saw **Juan Martinez** and said he was positive **Juan Martinez** was the man he was chasing in the grow site on the previous day, confirming my observation. **Juan Martinez** looked at Warden Shaw and smiled and said he remembered him.

14. I asked **Juan Martinez** if he would step outside the hotel room and talk to me and he complied. I explained to **Juan Martinez** that I wanted to talk to him, but I had to read him his Miranda rights first. I am not a fluent Spanish speaker, but I can read, write, speak and understand basic conversational Spanish. I began studying Spanish when I was five years old and took high school and college Spanish. I also speak Spanish with marijuana cultivators on a frequent basis in the course of my job responsibilities. I read **Juan Martinez** his rights from a pre-printed Spanish Miranda card issued by the Department of Fish and Wildlife. **Juan Martinez** said he understood his rights. **Martinez** waived his rights and agreed to answer questions. I asked **Juan Martinez** to tell me what happened on the previous day and he immediately said the marijuana was not his and that he was only a worker and was being paid two hundred dollars per day to work in the grow site. **Juan Martinez** said he had been in the grow site for two weeks and was told he would be in there for two more weeks. He said his job was to manicure the marijuana buds with scissors. **Juan Martinez** said there were a total of ten subjects working in the grow site with him and two of them were "bosses." **Juan Martinez** said he ran on the previous day because he was afraid. He said everybody started running and he was the last one to run, because he did not know what was going on. **Juan Martinez** said he did not know we were officers and thought we might be a rip-off crew. The interview was recorded.

15. I then asked **Armando Martinez** if he would step outside the hotel room and talk to me and he complied. I explained to **A. Martinez** that I wanted to talk to him, but I had to read him his Miranda rights first. I read **A. Martinez** his rights from the same pre-printed Spanish Miranda card. **A. Martinez** said he understood his rights. **A. Martinez** waived his rights and agreed to answer questions. I asked **A. Martinez** to tell me what happened on the previous day and he admitted to being in the grow site. **A. Martinez,** said he ran because he did not want to get arrested. He said he was to be paid two hundred dollars per day to trim and manicure the marijuana buds with scissors. **A. Martinez** said **Juan Martinez** is his brother and they are both from Clear Lake, California. **A. Martinez** said there were a total of ten people working in the grow site and they all ran. **A. Martinez** said the two bosses ran away without warning the others. **A. Martinez** said he had only been in the grow site for three days. I concluded the

interview. I told both **Juan** and **Armando Martinez** that I would talk to him in more detail with an officer who could speak fluent Spanish. **Armando Martinez** also gave me verbal consent to search his cell phone, which was in plain view on a bed. **Flores** had been talking on the cell phone when I initially knocked on the door. The interview of **Armando Martinez** was also recorded.

16. I then asked **Flores** if he would step outside the hotel room and talk to me and he complied. I explained to **Flores** that I wanted to talk to him, but I had to read him his Miranda rights first. I asked **Flores** if he preferred to speak in Spanish or English and he said he preferred English. I read **Flores** his rights from the other side of the same pre-printed Miranda card issued by the Department of Fish and Wildlife. **Flores** said he understood his rights. **Flores** waived his rights and agreed to answer questions. **Flores** said he is a construction worker from West Covina who does odd jobs. **Flores** said he was hired by a man who told him he would be doing construction and was taken to the mountains and told to hike up a trail. He said when he arrived at the grow site he realized what he was hired to do and got scared, but he did what he was told to do. **Flores** said there were ten people working in the grow site. **Flores** said he did not know any of the people working in the grow site and said he was to be paid two hundred dollars per day to trim and manicure the marijuana buds. **Flores** said he ran, because he was afraid. **Flores** said a man in a blue Ford Explorer dropped him off at the grow site. **Flores** said two men were in charge of the marijuana and they told everybody what to do. He said the two bosses were the ones who hiked down to the road to meet the supply driver and nobody else could leave the grow site. **Flores** gave me consent to search his cell phone, which was charging in the hotel room. I retrieved the phone after **Flores** gave consent to search the room, which he had booked. **Flores'** interview was recorded. All three men were then arrested.

17. On October 16, 2015, a team of USFS officers hiked into the grow site to eradicate the marijuana plants and remove them by helicopter. Due to the terrain and shortage of personnel, they were not able to eradicate the entire grow site. A total of 1,427 plants were counted and eradicated. Approximately 600 plants were left standing in the west portion of the grow site. A follow-up visit will be made to complete the eradication.

18. The marijuana cultivation operation caused significant environmental damage to the area of the grow site. The site was within the Giant Sequoia National Monument portion of Sequoia National Forest. Many of the native plants and trees were cut and trimmed to make room for the marijuana plants. Water was diverted from a spring that supports wildlife. Pesticides, including illegal zinc phosphide (Fosfuro de Zinc) smuggled to the United States from Mexico, were found at the site, in addition to fifty-pound bags of high nitrogen fertilizer. The grow site covered at least ten acres. Large piles of trash were found stuffed under boulders and buried along the stream. The water source for the grow site eventually drains into the Upper Kern River, which contains the unique Kern River rainbow trout.

## IV.

## CONCLUSION

19. Based on the foregoing, I believe that there is probable cause to charge and arrest **Armando Arnoldo Martinez, Juan Carlos Martinez-Tinoco, and Luis Enrique Flores.** for conspiring to manufacture, to distribute and to possess with the intent to distribute 1,000 or more marijuana plants, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846, and committing the depredation of government property with damage exceeding $1,000, in violation of Title 18, United States Code, Section 1361.

Your affiant swears under penalty of perjury that the facts presented are true and accurate to the best of my knowledge.

BRIAN ADAMS
Special Agent
United States Forest Service

Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) before me this __16__ day of October, 2015.

STANLEY A. BOONE
United States Magistrate Judge

Reviewed and approved as to form this 16th day of October, 2015

s/ Karen A. Escobar
KAREN A. ESCOBAR
Assistant U.S. Attorney