1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,                    No.  1:15-cr-00304-DAD-BAM

12                Plaintiff,

13         v.                                      ORDER RE DEFENDANT FLORES'
                                                   MOTION TO SUPPRESS FRUITS OF
14   LUIS FLORES, et al.,                          UNLAWFUL DETENTION AND
                                                   DEFENDANT JIMENEZ'S MOTION TO
15                Defendants.                      SUPPRESS STATEMENTS AND REQUEST
                                                   TO JOIN IN DEFENDANT FLORES'
16                                                 MOTION

17                                                 (Doc. Nos.  34, 35, 36, 37, 38, and 39)

18

19         Defendants Luis Flores, Armando Martinez-Tinoco, Juan Martinez-Tinoco, and Ivan

20   Jimenez are each charged in the indictment returned in this case with:  (1) conspiracy to

21   manufacture, to distribute and/or to possess with the intent to distribute marijuana in violation of

22   21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846; (2) manufacture of marijuana and aiding and

23   abetting  the same in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 18 U.S.C. § 2;

24   (3) possession with the intent to distribute marijuana and aiding and abetting the same in violation

25   of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 18 U.S.C. § 2; and (4) depredation of public lands

26   and resources and aiding and abetting the same in violation of 18 U.S.C §§ 1361 and 2.  (Doc.

27   No. 23.)

28   /////

                                                   1

On February 1, 2016, counsel on behalf of defendant Flores filed a motion to suppress the alleged unlawful detention and arrest of his client on October 16, 2015 as well as the fruits thereof.  (Doc. No. 35.)[1]  Defendants Juan Martinez-Tinoco and Armando Martinez-Tinoco joined in that motion.  (Doc. No. 37 and 38.)  On February 8, 2016, counsel on behalf of defendant Jimenez filed a motion to suppress statements attributed to Jimenez by law enforcement agents on the grounds that the statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  Counsel on behalf of defendant Jimenez requested an evidentiary hearing in connection with the motion to suppress his statement.  (Doc. No. 39.)  Defendant Jimenez also joined in defendant Flores' motion to suppress.  (*Id*.)

On April 8, 2016, the court held a hearing on the motions and to determine whether an evidentiary hearing was necessary to their resolution.  (Doc. No. 50.)  Assistant U.S. Attorney Karen Escobar appeared at the hearing on behalf of the government.  Attorney Gary Huss appeared on behalf of defendant Flores, attorney Peter Jones appeared on behalf of defendant Armando Martinez-Tinoco, attorney Daniel Harralson appeared on behalf of defendant Juan Martinez-Tinoco and Assistant Federal Defender Janet Bateman appeared on behalf of defendant Jimenez.  (*Id*.)  At the hearing, counsel for each of the parties agreed that no evidentiary hearing was necessary in order to resolve the pending motions.[2]  The court then heard oral argument and took the motion under submission for decision.

## I. The Evidence

Counsel for defendant Flores filed a declaration signed under penalty of perjury in support of the motion to suppress the fruits of the alleged unlawful detention and arrest of Flores and his two co-defendants.  (Doc. No. 36.)  That declaration included as exhibits the sworn affidavit of U.S. Forest Service Agent Brian Adams in support of the criminal complaint and arrest warrants

---

[1]  Counsel for defendant Flores did not request an evidentiary hearing in the motion filed with the court.

[2]  Counsel for defendant Jimenez, who had originally requested an evidentiary hearing in connection with the motion to suppress the statement made by Jimenez, took the position at the hearing that in light of subsequent discovery provided to the defense following the filing of the motion to suppress her client's statements, an evidentiary hearing was no longer necessary.

1   for defendants Flores, Armando Martinez-Tinoco and Juan Martinez-Tinoco dated October 16,

2   2015 as well as reports prepared by the investigating officers.  (*Id*.)  Defendant Jimenez filed his

3   own declaration.  (Doc. No. 39-1.)  In support of their opposition to the pending motions the

4   government filed two declarations by Agent Adams.  (Doc. Nos. 41-1 and 42-2.)  In reply,

5   defendants filed supplemental declarations by counsel for defendant Juan Martinez-Tinoco as

6   well as his defense investigator.  (Doc. Nos. 54 and 55.)  Collectively, these declarations and the

7   documents attached thereto as exhibits reflect the following.

8          On October 15, 2015, United States Forest Service ("USFS") Special Agents Brian

9   Adams and B. Smith along with K. Shaw, a warden with the California Department of Fish and

10  Wildlife, discovered a marijuana grow site in the Sequoia National Forest in Tulare County.

11  (Doc. No. 36, at 6 and 17.)  As the three walked through the grow site, Warden Smith yelled

12  "Runners!" and Agent Adams saw subjects running up a steep hillside in the opposite direction.

13  (*Id*.)  Agent Adams ran after the suspects but stopped after seeing a large campsite with numerous

14  tents and tarped areas in order to ensure there were no armed suspects in the camp.  (*Id*.)  After

15  doing so, Agent Adams then continued after the nearest subject.  (*Id*.)  Warden Shaw was closer

16  to that subject than Agent Adams and Adams could see Shaw running through the trees.  (*Id*.)

17  The three officers soon lost sight of the fleeing subjects and were also becoming separated from

18  one another.  (*Id*.)  Accordingly, Agent Adams called off the search for the subjects.  (*Id*.)  The

19  three officers returned to the campsite and collected evidence and destroyed the excess marijuana

20  and camping equipment.  (*Id*. at 7–8 and 17–18.)  Neither Agent Adam's later affidavit in support

21  of the complaint and arrest warrants nor the officers' investigative reports contained a description

22  of the subjects who had fled the grow site.

23          On October 16, 2015, USFS Officer J. Norris reported that a citizen had contacted him to

24  report suspicious activity.  (*Id*. at 8 and 18.)  Specifically, the citizen reported that:

25          [T]hree Hispanic male subjects [were] sitting near his gate on the
            Lloyd Meadow Road at 7:00 a.m.  This area is approximately a six
26          hour walk from the grow site.  The subjects were described as being
            wet and dirty.  The subjects did not have any camping gear or
27          backpacks with them.  The subjects asked the citizen for assistance.
            The three subjects were given a ride to Sierra Gateway Market in
28          Kernville and dropped off.  The citizen reported that the subjects

purchased new clothing and other items.  The citizen said two of the subjects were older and spoke only Spanish and one of the subjects was younger and spoke English.  One of the subjects was reported to be named "Luis."

(*Id*. at 8.)

Agent Adams responded to the Sierra Gateway Market and "was advised by the clerk that three subjects matching the citizen's description were dropped off at the store by a man who said he found them in the mountains.  The store clerk said the subjects walked south from the store after purchasing the items and he lost sight of them.  The clerk said they bought tourist-type clothing that said 'Kern River' on the shirts."  (*Id*. at 8 and 18.)  Agent Adams began checking roads, restaurants, and motels in the area looking for the three subjects.  (*Id*.)  The desk clerk of the Pine Cone Inn advised him that three subjects matching the description set forth above had just checked into room two.  (*Id*.)  After calling for assistance, Agent Adams did not wait for that assistance but instead proceeded to knocked on the door of room two.  (*Id*.)

Agent Adams reported that when he did so:

A younger Hispanic male, later identified verbally by the male as Luis Enrique Flores, opened the door.  Flores was wearing a blue shirt that said "Kern River" on the front.  I asked Flores if he had been in the mountains and he said yes.  I could smell the odor of campfire smoke emanating from Flores.  I asked the man what he was doing and he said camping near a very large rock.  I could see no camping gear in the room and was previously advised by the reporting citizen that the three men had no gear with them when he encountered them.  It was very cold and rainy in the mountains on the previous day and night and it would have been difficult and dangerous to be camping in that environment with no equipment.  I told the man I knew he was in a marijuana grow and that he had run from me and other officers on the previous day.  Flores denied the accusation.  I could see another, older, man, later identified by a Mexican identification card as Juan Carlos Martinez-Tinoco sitting on a bed in the room.  The man was very similar in appearance to the man Warden Shaw and I had chased on the previous day.  I told Juan Martinez I recognized him from the marijuana grow when he ran from me and he nervously denied he was there.  I asked where the third subject was and both Flores and Juan Martinez said he was in the shower.  Both Flores and Juan Martinez were looking nervously at each other and Flores was laughing nervously when I mentioned the marijuana grow site.  I asked the Flores if he would step outside of the hotel room and talked to me and he complied.  Flores continued to deny being in a marijuana grow.  I told Flores I was handcuffing him for my safety and placed him in handcuffs.  I then asked Flores and Juan Martinez if I could enter the room and I

was told I could enter.  I had Flores lay on the bed and asked Juan Martinez to stay seated.  I told both men they were not under arrest, but Flores was handcuffed for my safety.  I told Flores I would take off the handcuffs when additional units arrived on scene.  The third man came out of the shower approximately five minutes later and I asked him to sit in a chair.  The man complied.  The third man identified himself as Armando Arnoldo Martinez.  I told Armando Martinez he was not under arrest.  All three subjects kept trying to make statements to me but I told them not to talk at that time.  Additional units arrived several minutes later and I took the handcuffs off of Flores.  Warden Shaw arrived on scene and saw Juan Martinez and said he was positive Juan Martinez was the man he was chasing in the grow site on the previous day, confirming my observation.  Juan Martinez looked at Warden Shaw and smiled and said he remembered him.

(*Id*. at 8–9.)[3]

Agent Adams then separately read Flores, Juan Martinez-Tinoco, and Armando Martinez-Tinoco their *Miranda* rights.  (*Id*. at 10–11 and 19.)  Each of the three stated that they understood their rights, agreed to waive their rights, and individually made statements confirming their connection to the grow site.  (*Id*.)

On October 17, 2015, Officer Norris received a call at approximately 1:00 p.m. from Tulare County Sheriff's Deputy B. Minor regarding a Hispanic male subject in his twenties or early thirties who had been given a ride from the Lower Durwood Lodge in Tulare County to the McNally Ranch in Lake Isabella.  (*Id*. at 20.)  Deputy Minor had received a call from the owner of the lodge reporting that a subject had been dropped off at the R Ranch in Johnsondale and then taken to the Lower Durwood Lodge.  (*Id*.)  The subject had reportedly been separated from his friends and lost in the woods with no water or food after raccoons had eaten his food.  (*Id*.)  The subject was also reportedly carrying a blue bag and what appeared to be a bedroll.  (*Id*.)  R Ranch is three miles from the location where defendants Flores, Juan Martinez-Tinoco, and Armando Martinez-Tinoco had been first contacted the day before.  (*Id*.)  Also on the day before, Officer Norris saw a subject matching this same description walking south along the Lloyd Meadow

---

[3]  Because all parties took the position that an evidentiary hearing was unnecessary, no explanation has ever been provided as to why defendant Flores was handcuffed purportedly for purposes of officer safety while Agent Adams awaited his back-up assistance but defendants Armando Martinez and Juan Martinez-Tinoco were not handcuffed and instead merely told to remain seated inside the hotel room.

Road in the area of Lower Peppermint Campground, but did not stop because he was en route to eradicate the grow site. (*Id.*) Lower Peppermint Campground is approximately three miles from the grow site. (*Id.*)

On October 17, 2015, at approximately 1:12 p.m., Officer Norris called the McNally Ranch and spoke to a person identified as Brian. Brian said that a person had been dropped off at his ranch by Dee from the Lower Durwood Lodge. Brian said that this person told him he became separated from three of his friends while hiking. This person also said he was trying to get back to West Covina where he lived. Brian assisted the person by sending him to work with one of his plumbers so that he could make some money to get home. (*Id.*)

At approximately 1:34 p.m., Officer Norris advised Agent Adams that he had seen a subject matching the description given by Brian and Deputy Minor walking north on Navajo Drive. (*Id.* at 20–21.) Norris said that this was the same subject he had seen walking near Lower Peppermint Campground on the previous day. (*Id.* at 21.) The subject had a camouflage colored jacket. (*Id.*) Norris contacted the subject and detained him. (*Id.*) Agent Adams arrived at the intersection of Navajo Drive and Highway 178 approximately one minute after the subject had been detained by Officer Norris. (*Id.*) Agent Adams describes what took place thereafter as follows:

> I contacted the subject and identified him verbally as Ivan De Jesus Jimenez. I identified myself to him and told him he was not under arrest but was being detained. Jimenez spoke English. Using a ruse, I told Jimenez I recognized him as one of the men I had chased in the marijuana grow site on October 15, 2015. I explained the reason for our contact and he spontaneously said he and the other subjects ran from the grow site because they were afraid and he had been lost and was trying to find his way home. I stopped him and asked him not to say anything further. I did not ask Jimenez any questions or otherwise prompt any response from him. We then placed Jimenez in handcuffs and transported him to the Kern Valley Sherriff's Substation in Lake Isabella for further investigation. Officer Norris went to 5115 Shawnee and recovered the blue bag and bedroll that Jimenez had left there.

(*Id.* at 21.)

Once at the substation, Agent Adams read defendant Jimenez his *Miranda* rights. Jimenez stated he understood his rights, waived then, and gave an inculpatory recorded statement

connecting himself to the grow site.  (*Id*.)

## II. Discussion

### 1.  The Detention of Defendants Flores, Juan Martinez-Tinoco, and Armando Martinez-Tinoco

Defendant Flores argues in summary fashion that the scope and duration of his detention by Agent Adams at the Pine Cone Inn was "unreasonable under the circumstances, and that the fruits of that unlawful detention" should therefore be suppressed.  (Doc. No. 35 at 4.)  Flores briefly contends that his detention was unjustified prolonged and turned into a de facto arrest when he was handcuffed outside his hotel room and then told to lay down on the bed inside his room while Agent Adams waited for other officers to arrive in response to his call for assistance.  (*Id*. at 6–7.)  Finally, defendant Flores asserts that there was no probable cause or even articulable facts to justify the initiation of his detention, its prolongation or his arrest and that as a result the fruits thereof should all be suppressed.  (*Id*. at 7.)  Defendants Juan Martinez-Tinoco and Armando Martinez-Tinoco have joined in the motion and the arguments made in support thereof.  (Doc. Nos. 37 and 38.)[4]

#### a.  Seizure

A police officer may initiate a brief investigatory detention based on a reasonable suspicion that the individual detained has committed or is in the process of committing a crime.  *Terry v. Ohio*, 392 U.S. 1 (1968).  However, "[t]he Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons . . . that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  A seizure within the scope of the Fourth Amendment is not automatically found each

---

[4]  At the outset the court pauses to note that all of the litigation flowing from the detention of these three defendants could have been avoided had Agent Adams monitored the hotel room door while awaiting the arrival of the back-up he had called for, including Warden Shaw who was the only law enforcement officer who had gotten a good enough look at the one fleeing suspect the day before that he could identify him.  Had Agent Adams taken this prudent course, it is likely that the officers could have collectively approached the room, the identification of the one suspect could have been made and the arrests of all three carried out.  Had the suspects attempted to leave the room at some point before back-up arrived, they could then have been stopped and detained by Agent Adams while awaiting his fellow officers.  By instead jumping the gun, so to speak, and approaching the door alone, Agent Adams arguably created both an officer safety issue as well as the various issues posed by the pending motion to suppress evidence.

1    time a police officer approaches an individual and asks questions. *Florida v. Bostick*, 501 U.S.

2    429, 434 (1991).  No seizure under the Fourth Amendment takes place so long as a reasonable

3    person would feel free "to disregard the police and go about his business." *California v. Hodari*,

4    499 U.S. 621, 628 (1991). *See also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[A]

5    person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of

6    the circumstances surrounding the incident, a reasonable person would have believed that he was

7    not free to leave."); *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013).  However,

8    once an encounter loses its consensual nature, the Fourth Amendment is triggered. *Hodari*, 499

9    U.S. at 628.  To measure the consensual nature of an encounter, courts have found that "[o]nly

10   when the officer, by means of physical force or show of authority, has in some way restrained the

11   liberty of a citizen may we conclude that a 'seizure' has occurred." *Bostick*, 501 U.S. at 434

12   (quoting *Terry*, 392 U.S. at 19 n. 16). *See also Brendlin v. California,* 551 U.S. 249, 254 (2007);

13   *McClendon*, 713 F.3d at 1215.

14          In this case, defendant Flores was obviously not free to leave the room at the inn when

15   Agent Adams handcuffed him and instructed him to lie on the bed.  Likewise, defendants Juan

16   Martinez-Tinoco and Armando Martinez-Tinoco were not free to leave the room when Agent

17   Adams instructed them to be seated after he had placed Flores in handcuffs.  A reasonable person

18   would not have felt free to leave the hotel room under these circumstances.  Moreover, Agent

19   Adams demonstrated his authority by falsely asserting that he recognized Flores and Juan

20   Martinez-Tinoco as having fled from the marijuana grow site the day before, directing Juan

21   Martinez-Tinoco and Armando Martinez-Tinoco to be seated, and by placing handcuffs on Flores

22   and directing him to lie on the bed.

23          **b.  Full Custodial Arrest**

24              **i.  Legal Standard**

25          There is no "bright line rule for determining when an investigatory stop crosses the line

26   and becomes an arrest." *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002)

27   (quoting *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988)). *See also Green v. City and*

28   *County of San Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014).  Rather, the determination is a fact

1   intensive inquiry. *Gallegos*, 308 F.3d at 991 (citing *Washington v. Lambert*, 98 F.3d 1181, 1185

2   (9th Cir. 1996)). Making the determination of whether a seizure was an arrest "may in some

3   instances create difficult line-drawing problems." *United States v. Ricardo D.*, 912 F.2d 337,

4   339-40 (9th Cir. 1990). This sometimes difficult determination is "guided by the general Fourth

5   Amendment requirement of reasonableness." *Gallegos*, 308 F.3d at 991. The Fourth

6   Amendment requires the court to look at the totality of the circumstances and consider 1) the

7   intrusiveness of the stop, which includes the aggressiveness of the police methods, and 2) the

8   justification for the use of such tactics. *Washington* , 98 F.3d at 1185. The determination is

9   essentially an evaluation of "not only how intrusive the stop was, but also whether the methods

10  used were reasonable given the specific circumstances." *Id.*

11      An investigative detention must be "temporary and last no longer than is necessary to

12  effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). The methods

13  used during the stop should be the "least intrusive means reasonably available to verify or dispel

14  the officer's suspicion in a short period of time." *Id.*

15          *ii.  Evaluating the Intrusiveness of the Seizure*

16      Although there is no bright line test for evaluating whether a stop has become an arrest,

17  factors have been identified that courts may consider in making that determination. *Washington* ,

18  98 F.3d at 1188–90 (listing several factors courts may consider and discussing how each factor

19  affects the analysis*); see also Green*, 751 F.3d at 1047. For instance, whether a suspect is

20  transported may be considered in determining whether a stop became an arrest. "[T]he police

21  may move a suspect without exceeding the bounds of an investigative detention when it is a

22  reasonable means of achieving the legitimate goals of the detention 'given the specific

23  circumstances of the case.'" *United States v. Charley*, 396 F.3d 1074 (9th Cir. 2005) (quoting

24  *Gallegos*, 308 F.3d at 991. Reasons of safety or security may justify the transportation of a

25  suspect during a stop, but absent these justifications the stop may ripen into an arrest where

26  transportation of the suspect is involved. *Royer*, 460 U.S. at 504 (finding an arrest when the

27  officers transported the suspect forty feet to a private room without any cause to believe the

28  suspect posed a danger or flight risk); *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir.

9

1990) (fact that a suspect was removed from his car and made to lie down in the street was a factor in determining whether an arrest had occurred).  The court may also look to the suspect's actions in evaluating the impact of the officer's actions in transporting him.  Thus, where a suspect is complying with all orders and there is no reason to believe he is armed, transporting the suspect to another location may be deemed excessive and indicative of an arrest.  *Ricardo D.*, 912 F.2d at 340 (finding there was an arrest where the suspect did not try to run away and complied with all of the officers' orders but was nonetheless transported to the police patrol car and held inside the car).

The length or duration of a detention is another factor to consider in making this determination.  *Washington*, 98 F.3d at 1189 n. 11.  In *Gallegos*, ordering the suspect from his car at gunpoint, handcuffing him, transporting him back to the scene of the incident, and holding him for 45 minutes was found not to constitute an arrest.  308 F.3d at 991.  Although the suspect was held for 45 minutes to an hour, the Ninth Circuit observed that the Supreme Court had placed "no rigid time limitation on *Terry* stops."  *Id*. at 992 (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).  In that case, the police had stopped Gallegos because they thought he was an individual who had been attempting to enter someone's home by force.  *Id*.  The officers held him long enough to escort him to the scene of the crime to confirm an identification.  *Id*.  The length of the stop under those circumstances was found not unreasonable because the officers were diligently carrying out their investigation and "especially since he was neither handcuffed nor in the patrol car the whole time."  *Id*.[5]  On the other hand, in other cases the actions of law enforcement officers have been found sufficiently aggressive and intrusive that even a brief stop has been found sufficient to constitute an arrest.  *Cf. United States v. Delgadillo-Velasquez*, 856 F.2d 1292 (9th Cir. 1988) (holding that the stop constituted an arrest because "[t]he show of force

/////

---

[5]  The government focuses in large part on the 37 minute length of the detention prior to Warden Shaw's arrival at the inn and his identification of one of the suspects, arguing that longer detentions have been found to be reasonable.  (Doc. No. 41 at 8-10.)  To the extent the government relies on decisions addressing the detention of luggage in order to arrange a dog sniff, those decisions are factually distinguishable from the situation presented here where several other factors including the use of restraints are present.

1  and detention techniques used in this context are indistinguishable from police conduct in an

2  arrest.").

3         The use of handcuffs or other restraints is another factor to be considered in whether an

4  arrest has taken place.  Thus, it has been observed that use of restraints "substantially aggravates

5  the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry*

6  stop." *Washington*, 98 F.3d at 1188 (quoting *United States v. Bautista*, 684 F.2d 1286, 1289 (9th

7  Cir. 1982)).  Under ordinary circumstances, when the law enforcement officers have only

8  reasonable suspicion to make an investigatory stop, drawing weapons and employing handcuffs

9  and other restraints has been found to violate the Fourth Amendment.  *Washington*, 98 F.3d at

10 1187; *Del Vizo*, 918 F.2d at 825; *Delgadillo-Velasquez*, 856 F.2d at 1295.  The degree of restraint

11 imposed on a suspect must be justified; reasonable suspicion of a crime without suspicion of

12 danger or more is insufficient to justify use of significant restraints.  *Del Vizo*, 918 F.2d at 825

13 (where the police had suspicion to believe the suspect was involved in a drug transaction, it

14 nonetheless did not justify the degree of restraint employed).  In fact, even markedly less intrusive

15 police action then that employed here has been held to constitute an arrest when the inherent

16 danger of the situation did not justify the intrusive action taken.  *See* e.*g., Ricardo D.*, 912 F.2d at

17 340–42 (finding an arrest occurred where police held suspect in patrol car for twenty minutes

18 without drawing weapons or handcuffing him); *United States v. Robertson*, 833 F.2d 777, 781

19 (9th Cir. 1987) (arrest found where officers drew guns and detained suspect, neither handcuffed

20 nor in a police car, for five to fifteen minutes); *id.* at 787 (Noonan, J., dissenting) (acknowledging

21 that if the police had ordered suspect to "prone out" it probably would have constituted an arrest

22 even if the police did not handcuff or touch the suspect); *Kraus v. County of Pierce*, 793 F.2d

23 1105, 1109 (9th Cir. 1986) (holding that arrest occurred where police used guns and searchlights

24 but neither handcuffed suspects nor restrained them in a police car).  Of course, despite these

25 holdings, legitimate safety and security reasons can justify the use of handcuffs under some

26 circumstances and still not transform the encounter into an arrest.  *See United States v. Nava*, 363

27 F.3d 942, 943 (9th Cir. 2004); *see also United States v. Bautista*, 684 F.2d 1286, 1289-90 (9th

28 Cir. 1982).

An additional factor courts have considered in analyzing the reasonableness of the use of aggressive law enforcement tactics as part of a *Terry* stop is the number of officers present.  For example, it has been found that where a police officer approaches suspects with his gun drawn, "it was prudent" for him to do so because he was alone and outnumbered.  *United States v. Serna-Barreto*, 842 F.2d 965, 968 (7th Cir. 1988) (distinguishing *United States v. Ceballos*, 654 F.2d 177 (2d Cir. 1981) where numerous policemen approached and surrounded a single suspect with guns drawn); *see also United States v. Jacobs*, 715 F.2d 1343, 1346 (9th Cir. 1983) (holding that it was reasonable shortly after a bank robbery for a single officer to order two suspects out of the car at gunpoint and to "prone out").  Finally, courts have considered the specificity of the information leading officers to suspect that the individuals they intend to question are the actual suspects being sought.  *See Alexander v. Cty. of Los Angeles*, 64 F.3d 1315, 1322 (9th Cir. 1995).

### iii. The Methods Employed Here

In this case, defendant Flores did nothing immediately prior to or during his encounter with Agent Adams to justify the use of handcuffs as part of a *Terry* stop.  No weapons were reported to have been found at the grow site, neither Flores, Juan Martinez-Tinoco, or Armando Martinez-Tinoco were suspected of committing a violent crime, Agent Adams saw no camping gear in the room and had been previously advised by the reporting citizen that the three men had no gear or backpacks with them, and no one had reported that any of the three suspects had been seen with a weapon.  The three men cooperated in every way with Agent Adams when he came to their door.  Agent Adams transported Flores from outside the hotel room, where he handcuffed him, back inside the room and onto the bed.  Despite Agent Adam's statement to the three occupants that they were not under arrest, the absolute curtailment of defendant Flores' liberty by handcuffing him and directing him to lie on the bed and in instructing defendants Juan Martinez-Tinoco and Armando Martinez-Tinoco to stay seated would clearly have lead a reasonable person to believe that they were not free to leave.  *Cf. United States v. Strickler*, 490 F.2d 378, 380 (9th Cir. 1974) ("No significant, new restraint was added when [an officer] . . . handcuffed Strickler and formally pronounced him 'under arrest.'").

/////

12

1    In these respects, this case most closely resembles that confronted by the court in *Del*

2  *Vizo*, where the Ninth Circuit held that in light of the defendant's complete cooperation at the

3  scene and lack of evidence that he was dangerous, an arrest had occurred on the basis of

4  aggressive police actions, including handcuffing the defendant and drawing weapons. 918 F.2d at

5  825 (distinguishing *United States v. Taylor*, 716 F.2d 701 (9th Cir. 1983), where the suspect was

6  not cooperative and police had been warned he was dangerous).[6] Here, while agent Adams was

7  by himself when he arrived at the hotel room,[7] he did not draw his weapon and all three

8  individuals inside the room were fully cooperative.

9    Accordingly, the undersigned concludes that from the point Agent Adams handcuffed

10  defendant Flores and ordered defendants Juan Martinez-Tinoco and Armando Martinez-Tinoco to

11  remain seated, the detention was not justified under *Terry* and in fact constituted an arrest.

12    ***c.   The Investigatory Stop***

13    Investigatory stops are justifiable under the Fourth Amendment if the officer has

14  reasonable suspicion that a person has committed or is about to commit a crime.  *Royer*, 460 U.S.

15  at 498.  Further, the stop must be "reasonably related in scope to the justification for [its]

---

16  [6]  Notably, the defendant in *Del Vizo* was believed by officers to be a drug dealer and the court

17  nonetheless concluded that under the totality of the circumstances test the aggressive actions

18  taken by police constituted an arrest.  918 F.2d at 825; *see also Delgadillo–Velasquez*, 856 F.2d at
   1294–96 (finding an arrest without probable cause had occurred).  This was the court's

19  conclusion notwithstanding recognition of the dangers inherent in the drug trade.  *See, e.g.,*

20  *United States v. McConney*, 728 F.2d 1195, 1206 (9th Cir. 1984), *overruling on other grounds*
   *recognized by United States v. Carnou*, 773 F.3d 932, 940 (9th Cir. 2014).

21  [7]  Defendants filed a declaration and photographs taken by Roberta Gordon, the owner of the Pine

22  Cone Inn, indicating that by 10:02 a.m. there were five officers present at the scene.  (Doc. Nos.
   54 and 55.)  By contrast, in his declaration, agent Adams stated that "[b]y checking the USFS

23  dispatch log, I know that at approximately 9:43 a.m., I contacted USFS dispatch and asked for a

24  back-up unit.  At approximately 9:48 a.m., USFS dispatch called back and said Kern County
   Sheriff's Office (SO) had been advised and deputies were responding to my location . . . .  I

25  believe that Warden Shaw arrived at approximately 10:20 a.m. and Kern County SO deputies
   arrived several minutes later."  (Doc. No. 41-1, at 2.)  In any event, as indicated above, Agent

26  Adams initiated this encounter and knocked on the door at the inn "[a]fter calling for assistance."
   (Doc. No. 36, 8.)  As it turns out, it appears he would have had to wait only 19 minutes for law

27  enforcement assistance to arrive obviating any safety concerns and at most only 37 minutes until
   Warden Shaw, who could have positively identified at least one of the suspects from the previous

28  day, to arrive.

1   initiation." *Terry*, 392 U.S. at 29.  Here, Agent Adams had a reasonable suspicion that the three

2   individuals who had checked into the hotel room had fled the grow site the day before.  This

3   reasonable suspicion was based on the information provided by the reporting citizen, the clerk at

4   the Sierra Gateway Market and the desk clerk of the Pine Cone Inn.

5         Agent Adams' investigatory action in knocking on the hotel room door was certainly

6   permissible.  *See United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000) (police may do

7   what any other citizen could do and may approach a hotel room door and knock on it with the

8   hope that someone will speak to them and without any reasonable suspicion).  Agent Adams was

9   investigating.  However, when he placed handcuffs on Flores and ordered Juan Martinez-Tinoco

10  and Armando Martinez-Tinoco to remain seated in the room the investigation turned into an

11  arrest requiring probable cause.

12         ### d.   The Arrest Was Not Supported By Probable Cause

13        When Agent Adams arrested defendants Flores, Juan Martinez-Tinoco, and Armando

14  Martinez-Tinoco, he did not have probable cause to believe that the three had fled from the grow

15  site the day before.  There is no evidence before the court that Agent Adams himself had

16  identified any of the three as being seen at the grow site.[8]  In his report, agent Adams stated only

17  that defendant Juan Martinez-Tinoco was "very similar in appearance" to the man he had chased

18  the day before but did not include any descriptive detail about the suspects.  (*Id*. at 8, 17.)  Agent

19  Adams also reported that he told Juan Martinez-Tinoco that "I recognized him from the marijuana

20  grow when he ran from me."  (*Id*.)  However, this appears to have merely been the same ruse

21  Agent Adams employed on Jimenez the following day, since nothing in his report states that

22  Agent Adams actually recognized Juan Martinez-Tinoco as the man he chased from the grow site.

23  Warden Shaw, who did not arrive at the inn until after the defendants' arrest had occurred, was

24  the only law enforcement officer who had gotten a good look at one of the suspects in the grow

25  site and could "positive[ly]" identify Juan Martinez-Tinoco as being the man seen by him the day

26  ───────────────

    [8]  In fact, such an assertion is conspicuously absent from Agent Adams' declaration.  Again, the
27  government took the position that no evidentiary hearing was necessary to resolve the pending
    motions.  Accordingly, the court can only conclude, based upon the documentary evidence before
28  it, that Agent Adams could not identify any of the suspects who were present at the grow site.

1    before at the site.  (Doc. No. 41-1, at 1.)

2         Thus, the information provided by the reporting citizen, the clerk at the Sierra Gateway

3    Market, and the desk clerk of the Pine Cone Inn justified Agent Adams' investigation, but did not

4    provide him with probable cause to arrest.

5         **e.    The Fruit of the Poisonous Tree**

6         Defendants have merely argued that because Agent Adams lacked probable cause, their

7    "detention, and . . . arrest and the fruits thereof should be suppressed," without identifying what

8    the defendants consider to be the fruits of the unlawful arrests.  (Doc. No. 35 at 7.)  The

9    government has not addressed this issue at all, arguing only that the detention and arrest of the

10   defendants was lawful.  (Doc. Nos. 41, 49.)

11         The Supreme Court has held that evidence is to be suppressed as the fruit of an unlawful

12   arrest,

13
> whether such evidence be tangible, physical material actually seized
> in an illegal search, items observed or words overheard in the
14
> course of the unlawful activity, or confessions or statements of the
> accused obtained during an illegal arrest and detention.
15

16   *United States v. Crews*, 445 U.S. 463, 470 (1980).  Thus, it is clearly established that confessions

17   obtained following an unlawful arrest are to be suppressed "unless the confession was 'an act of

18   free will [sufficient] to purge the primary taint of the unlawful invasion.'"  *Kaupp v. Texas*, 538

19   U.S. 626, 632–33 (2003) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).

20   Therefore, even where *Miranda* warnings are given following an unlawful arrest, the prosecution

21   bears the burden of establishing that sufficient time elapsed or "intervening circumstances" took

22   place sufficient to remove the taint of the unlawful arrest such that a defendant's confession can

23   be said to have constituted an act of free will.  *See Brown v. Illinois*, 422 U.S. 590, 603–04

24   (1975).  In short, *Miranda* warnings do not act as a "cure-all," rendering voluntary all confessions

25   obtained after illegal arrests, because such a rule would reduce "the constitutional guarantee

26   against unlawful searches and seizures . . . to a form of words."  *Brown*, 422 U.S. at 602–03.  *See*

27   *also United States v. Nora,* 765 F.3d 1049, 1057 (9th Cir. 2014) (defendant's incriminating

28   statements made immediately upon the heels of the unlawful search of his person suppressed as

15

1    the fruit of the poisonous tree because the government did not meet its burden of showing

2    intervening circumstances or dissipation of the taint); *United States v. Patzer,* 277 F.3d 1080,

3    1085 (9th Cir. 2002)*; United States v. Sanuda-Perez,* 564 F.2d 1288, 1291 (9th Cir. 1977); *United*

4    *States v. Cruz-Roman,* 312 F. Supp.2d 1355, 1366 (W.D. Wash. 2004) ("The defendant's post-

5    warning statements and evidence seized in searches made after "consent to search" was given by

6    Mr. Cruz–Roman must also be suppressed as tainted fruits of an unlawful search and arrest.")

7        In this case, immediately following Warden Shaw's arrival and identification of defendant

8    Juan Martinez-Tinoco, all three defendants were Mirandized and made statements.  (Doc. No. 36

9    at 9-11.)  In addition, defendants Armando Martinez-Tinoco and Flores gave Agent Adams

10   consent to search their cell phones and defendant Flores gave Agent Adams consent to search the

11   hotel room.  (*Id*. at 11.)  Thus, it is clear that Warden Shaw's identification of defendant Juan

12   Martinez-Tinoco, the statements made by all three defendants at the scene of their detention and

13   arrest, the searches of their cell phones and the hotel room all followed immediately on the heels

14   of their unlawful arrests which were unsupported by probable cause.  Accordingly, all of that

15   evidence is properly suppressed as the poisonous fruit of the unlawful arrests.

16       2.  **The Interrogation of Defendant Jimenez**

17       Defendant Jimenez has moved to suppress his inculpatory statements made to Agent

18   Adams and Officer Norris on the roadside, arguing that without a *Miranda* warning, his

19   statements were made in "direct responses to . . . interrogation techniques" and occurred while he

20   "reasonably understood that he was in custody and was not free to leave." (Doc. No. 39, at 5.)

21   Defendant Jimenez also contends that Agent Adams' actions constituted questioning which was a

22   pre-*Miranda* custodial interrogation tainting his later *Mirandized* interrogation at the police

23   substation.  (*Id*.)  According to defendant Jimenez, employment of this tactic violated the holding

24   of the Supreme Court in *Missouri v. Seibert*, 542 U.S. 600 (2004).  (*Id*.)  Based on these

25   arguments defendant Jimenez seeks to suppress all of his statements made to law enforcement

26   officers.  (*Id*. at 6.)

27   /////

28   /////

16

1  *a. Legal Standard*

2  The Fifth Amendment to the United States Constitution provides that "[n]o person . . .

3  shall be compelled in any criminal case to be a witness against himself[.]"  U.S. Const. amend. V.

4  The Supreme Court has "recognized that custodial interrogations, by their very nature, generate

5  'compelling pressures which work to undermine the individual's will to resist and to compel him

6  to speak where he would not otherwise do so freely.'"  *Moran v. Burbine*, 475 U.S. 412, 420

7  (1986) (quoting *Miranda*, 384 U.S. at 467).  "To combat this inherent compulsion, and thereby

8  protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police

9  an obligation to follow certain procedures in their dealings with the accused."  *Moran*, 475 U.S. at

10  420.  *See also Dickerson v. United States*, 530 U.S. 428, 435 (2000); *United States v. IMM*, 747

11  F.3d 754, 764 (9th Cir. 2014).   Specifically, the Supreme Court has held the Constitution

12  requires

13
14
15
16
> that a person questioned by law enforcement officers after being
> "taken into custody or otherwise deprived of his freedom of action
> in any significant way" must first "be warned that he has a right to
> remain silent, that any statement he does make may be used as
> evidence against him, and that he has a right to the presence of an
> attorney, either retained or appointed."

17  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda*, 384 U.S. at 444).  *See also*

18  *IMM*, 747 F.3d at 764.  "An officer's obligation to administer *Miranda* warnings attaches . . .

19  'only where there has been such a restriction on a person's freedom as to render him "in

20  custody."'"  *Stansbury*, 511 U.S. at 322 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

21  The Supreme Court has defined "custodial interrogation" as "questioning initiated by law

22  enforcement officers after a person has been taken into custody or otherwise deprived of his

23  freedom of action in any significant way."  *Miranda*, 384 U.S. at 444 (1966).  This definition has

24  been refined to recognize that "'interrogation' under *Miranda* refers not only to express

25  questioning, but also to any words or actions on the part of the police (other than those normally

26  attendant to arrest and custody) that the police should know are reasonably likely to elicit an

27  incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  *See*

28  *also Kemp v. Ryan*, 638 F.3d 1245, 1255 (9th Cir. 2011).

1       *b. In Custody*

2          "Two discrete inquiries are essential to the ['in custody'] determination:  first, what were

3 the circumstances surrounding the interrogation; and second, given those circumstances, would a

4 reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."

5 *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  *See also IMM*, 747 F.3d at 765.  The Ninth

6 Circuit has further delineated that "[t]o determine whether an individual was in custody, a court

7 must, after examining all of the circumstances surrounding the interrogation, decide 'whether

8 there [was] a formal arrest or restraint on freedom of movement of the degree associated with a

9 formal arrest.'"  *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (quoting *Stansbury*, 511

10 U.S. at 322).  *See also IMM*, 747 F.3d at 765.  The non-exhaustive list of factors to be considered

11 in making the determination of whether the individual was in custody included:  "(1) the language

12 used to summon the individual; (2) the extent to which the defendant is confronted with evidence

13 of guilt; (3) the duration of the detention; and (5) the degree of pressure applied to detain the

14 individual."  *Kim*, 292 F.3d at 974 (citations omitted).  *See also United States v. Cazares*, 788

15 F.3d 956, 981 (9th Cir. 2015); *United States v. Wright*, 625 F.3d 583, 602 (9th Cir. 2010).

16          The Ninth Circuit has considered a "police-dominated atmosphere" as the benchmark for

17 custodial interrogations in locations outside of the police station.  *United States v. Craighead*, 539

18 F.3d 1073, 1083 (9th Cir. 2008) ("[W]hen applying *Miranda* to the task of sorting a non-custodial

19 in-home interrogation from a custodial one, our analysis considers the extent to which the

20 circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of

21 the home into a 'police-dominated atmosphere.'").  Several factors are relevant in determining

22 whether the circumstances of an interrogation created a "police-dominated atmosphere;"  "(1) the

23 number of law enforcement personnel and whether they were armed; (2) whether the suspect was

24 at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated

25 from others; and (4) whether the suspect was informed that he was free to leave or terminate the

26 interview, and the context in which any such statements were made."  *Id*. at 1084.  "[T]he initial

27 determination of custody depends on the objective circumstances of the interrogation, not on the

28 subjective views harbored by either the interrogating officers or the person being questioned."

1    *Stansbury*, 511 U.S. at 323. *See also Kim*, 292 F.3d at 973.

2        Here, it is undisputed that no *Miranda* warnings were given during defendant Jimenez's

3    initial encounter with Agent Adams and Officer Norris on the side of the road. Agent Adams'

4    reports indicate that Officer Norris contacted Jimenez, "detained him," and that Agent Adams

5    arrived approximately one minute thereafter. (Doc. No. 36, at 21.) According to Agent Adams,

6    upon his arrival:

> I contacted the subject and identified him verbally as Ivan De Jesus Jimenez. I identified myself to him and told him he was not under arrest but was being detained. Jimenez spoke English. Using a ruse, I told Jimenez I recognized him as one of the men I had chased in the marijuana grow site on October 15, 2015. I explained the reason for our contact and he spontaneously said he and the other subjects ran from the grow site because they were afraid and he had been lost and was trying to find his way home. I stopped him and asked him not to say anything further. I did not ask Jimenez any questions or otherwise prompt any response from him. We then placed Jimenez in handcuffs and transported him to the Kern Valley Sherriff's Substation in Lake Isabella for further investigation.

14   (*Id.*)

15   This initial encounter between law enforcement and defendant Jimenez occurred on a public road

16   and not at the police station. Thus, the court must consider whether the encounter nonetheless

17   took place in a "police-dominated atmosphere" and in doing so must weigh the factors set forth

18   above. *Craighead*, 539 F.3d at 1083.

19       First, the court considers the number of law enforcement personnel and whether they were

20   armed. Here, two law enforcement officers arrived at the scene separately. While this is not the

21   case where "the number of law enforcement personnel far outnumber[ed] the suspect," the

22   number of officers did outnumber Jimenez two to one and the fact that the officers arrived

23   separately suggests that it was not a routine stop. *Id.* at 1084–85. However, there is no evidence

24   before the court as to whether or not Agent Adams and Officer Norris were armed. Accordingly,

25   this factor does not heavily support or detract from the finding of a "police-dominated

26   atmosphere."

27       Second, the court considers whether the suspect was at any point restrained, either by

28   physical force or by threats. There is no evidence that defendant Jimenez was physically

restrained during the encounter.  However, Officer Norris did initially "detain" him and upon Agent Adams' arrival, he too explicitly told Jimenez that he was being detained.  Agent Adams also falsely told defendant Jimenez that Adams "recognized him as one of the men [he] chased in the marijuana grow site."  An objective person would not believe that his detention would be temporary and brief and that he would then be allowed to continue on his way when a law enforcement officer accuses that person of participating in a marijuana grow and evading police. *See Beckwith v. United States*, 425 U.S. 341, 346–347 (1976) ("'It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial questioning'") (quoting *United States v. Caiello*, 420 F.2d 471, 473 (2nd Cir. 1969)).  Accordingly, this factor supports a finding of a "police-dominated atmosphere."

Third, the court considers whether the suspect was isolated from others.  Here, Jimenez was by himself with the two officers.  He was also on a public road in a small residential community where passersby could witness the interaction, although there is no indication that any did.  This is not the case of a motorist being detained pursuant to a routine roadside traffic stop. *See Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).  However, its public location also supports the notion that this was not a "police-dominated atmosphere."  *See id.* at 438 (public nature of traffic stop offsets any aura of police authority).

Fourth, the court must consider whether the suspect was informed that questioning was voluntary and that he was free to leave or terminate the interview.  If a law enforcement officer informs the suspect that he is not under arrest, that any statement is voluntary, and that he is free to leave at any time, such a communication greatly reduces the chance that a suspect will reasonably believe he is in custody.  *Craighead*, 539 F.3d at 1087.  Here, Agent Adams told defendant Jimenez that he was not under arrest.  However, he did not tell Jimenez that any statements he made would be voluntary and that he was free to leave at any time.  Indeed, Agent Adams specifically told Jimenez that he was being detained.  Likewise, there is no evidence as to what Officer Norris told Jimenez upon making contact with him.  All that is known is that Norris communicated to Agent Adams that Jimenez had been detained before Adams' arrival.  Most

1    importantly, Agent Adams falsely told Jimenez that he "recognized him as one of the men [he]

2    chased in the marijuana grow site."  (Doc. No. 36, at 21.)  This statement by a law enforcement

3    officer strongly suggested that Jimenez was not free to leave or terminate the encounter.  Thus,

4    consideration of this factor strongly supports the conclusion of a "police-dominated atmosphere."

5           Accordingly, in this close case at least two of the four *Craighead* factors support the

6    conclusion that a "police-dominated atmosphere" existed when defendant Jimenez was first

7    encountered by Agent Adams and Officer Norris.  The court is convinced that a reasonable

8    person in Jimenez's position would have felt deprived of his freedom of action in a significant

9    way, such that he would not have felt free to leave.  Accordingly, the court concludes the totality

10   of the circumstances here indicates that defendant Jimenez was "in custody" for purposes of

11   *Miranda*.  Next, the court must consider whether Agent Adams or Officer Norris interrogated

12   Jimenez.

13          *c.   Interrogation*

14          "The standard for determining whether an officer's comments or actions constitute the

15   'functional equivalent' of interrogation is quite high . . . ."  *United States v. Morgan*, 738 F.3d

16   1002, 1005-06 (9th Cir. 2013) (*quoting United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir.

17   2000)).  Subjecting a suspect to "subtle compulsion," without more, is not the functional

18   equivalent of an interrogation.  *Morgan*, 738 F.3d at 1006 (*quoting Innis*, 446 U.S. at 303.)

19   Rather, a defendant must show that his statement "was the product of words or actions on the part

20   of the police that they should have known were reasonably likely to elicit an incriminating

21   response."  *Id.; See, e.g., Innis, 446 U.S. at 301* (holding that a dialogue between two officers in

22   the defendant's presence regarding the possibility that a handicapped child would find the gun the

23   defendant had used in committing a murder did not constitute interrogation in violation of

24   *Miranda*); *United States v. Moreno–Flores*, 33 F.3d 1164, 1169–70 (9th Cir. 1994) (holding that

25   an agent's statements to the defendant that approximately 600 pounds of cocaine had been seized

26   and that the suspect was in trouble, were not the functional equivalent of interrogation because

27   they did not invite a response from the suspect); *United States v. Thierman*, 678 F.2d 1331, 1336

28   (9th Cir. 1982) ("[T]he conversations were brief and concerned the likely course of the police

1   investigation and the possible consequences of the suspect's failure to cooperate with the police . .

2   . . . There is nothing in the record to compel a finding that the police conversation was more

3   evocative than the one at issue in *Innis*."); *but see United States v. Orso*, 266 F.3d 1030 (9th Cir.

4   2001) (where officer "engaged Orso in several minutes of detailed discussion regarding the

5   evidence against her" and "even went so far as to make up some of the evidence," this was

6   equivalent of interrogation, because even though the officer "admonished her not to speak, . . . it

7   was reasonably likely his comments would cause her to respond").

8          Instructive in considering the issue posed in the present case is the decision in

9   *Shedelbower v. Estelle*, 885 F.2d 570, 573 (9th Cir. 1989).  There, a law enforcement officer

10  truthfully told the suspect that his accomplice was in custody but also falsely informed the suspect

11  that the rape/attempted murder victim had identified his photograph as one of the men who raped

12  her.  885 F.2d at 572.  The suspect then told the officers that he "had to tell" them and that he

13  wanted to talk about the case and did not need an attorney.  *Id*.  On appeal from the denial of

14  federal habeas relief, the Ninth Circuit held that the officer's statements to the suspect were not in

15  the form of question and thus did "not constitute an interrogation in the normal sense of the

16  word."  *Id*. at 573.  Moreover, the court concluded that the statements, including the falsehood

17  regarding the victim's identification of him, "were not the functional equivalent of questioning"

18  and were "not the type of comments that would encourage [the suspect] to make some

19  spontaneous incriminating remark."  *Id*.  *See also Johnson v. Whitely*, 959 F.2d 240, 1992 WL

20  64755, at *2 (9th Cir. 1992) (referring to the holding in *Shedelbower* and observing that "[t]elling

21  Johnson the police would have asked him why he did it is a little closer to the line, but still

22  nowhere near as evocative as the statements in the other cases that have been held not to

23  constitute the functional equivalent of interrogation.").  Of course, this court is bound by the

24  Ninth Circuit's decision in *Shedelbower.  But see Weeks v. Angelone*, 4 Supp. 2d 497, 531 (E.D.

25  Va. 1998) (Acknowledging the holding in *Shedelbower* but noting that "while it may be true" that

26  /////

27  /////

28  /////

22

1   a "false statement is not necessarily equivalent to interrogation, "a false statement is also certainly

2   not evidence that there was not an interrogation.").[9]

3        In this case, Agent Adams reported that he merely identified himself, falsely stated that he

4   "recognized [Jimenez] as one of the men [he] had chase in the marijuana grow site," and

5   explained the reason for the contact, before Jimenez stated that he and other subjects ran from the

6   grow site because they were afraid.  (Doc. No. 36, at 21.)[10]  Thus, this case is not like *Orso* where

7   there was an extended dialogue between the law enforcement officer and the defendant which

8   resulted in the latter making an incriminating statement.  Rather the situation here closely

9   resembles that confronted by the court in *Shedelbower* where a law enforcement officer's false

10  statement about the evidence against the defendant was found not to be the functional equivalent

11  of interrogation.  As the Supreme Court explained in *Innis*, "the police . . . . cannot be held

12  accountable for the unforeseeable results of their words or actions."  446 U.S. at 301–02.

13       Based upon the authorities discussed above, the undersigned concludes that Agent

14  Adams' statement to Jimenez during their initial encounter on the road was not an interrogation or

15  the functional equivalent thereof.  Accordingly, Agent Adams was not required to *Mirandize*

16  Jimenez before speaking to him.

17       *d.  Mid-Stream Miranda Warnings*

18       Defendant Jimenez also argues that Agent Adams engaged in impermissible piecemeal

19  questioning before giving him the required *Miranda* warnings.  (Doc. No. 48, at 2.)  The Ninth

20  Circuit has summarized the approach taken by the Supreme Court in addressing the admissibility

21

22  [9]  In fact, the District Court in *Weeks* reached the conclusion that "[i]f anything, false statements
    that are deliberately made do indicate an intent to illicit an incriminating response."  4 F. Supp. 2d

23  at 531.  There is a logical appeal to that conclusion.  If not made for purposes of hoping to draw
    out an incriminating response, why else would an officer go to the trouble of concocting a ruse?

24  "To make small talk" does not seem a reasonable explanation.  Nonetheless, as noted above, this
    court is bound by the Ninth Circuit's decision in *Shedelbower.*

25

26  [10]  Here, Agent Adams has submitted a declaration under penalty of perjury stating that he "was
    not trying to elicit a response from Jimenez or otherwise trick Jimenez into making a

27  statement[.]"  (Doc. No. 43-1 at 1-2.)  *See United States  v. Crisco*, 725 F.2d 1228, 1232 (9th Cir.
    1984) ("The agent's intent in making the remarks, while not conclusive, is relevant in

28  determining whether the remark was reasonably likely to elicit an incriminating response.").

1  of a confessions obtained after *Miranda* warnings have been given but preceded by an earlier,

2  unwarned confession, as follows:

3    > In *Oregon v. Elstad*, 470 U.S. 298 (1985), the Court held that a
   > "suspect who has once responded to unwarned yet uncoercive
4    > questioning is not thereby disabled from waiving his rights and
   > confessing after he has been given the requisite *Miranda* warnings."
5    > *Id.* at 318.  However, in *Missouri v. Seibert*, 542 U.S. 600 (2004), a
   > plurality opinion, the Court distinguished *Elstad*, and concluded
6    > that "when interrogators question first and warn later," the issue "is
   > thus whether it would be reasonable to find that in these
7    > circumstances the warnings could function 'effectively' as *Miranda*
   > requires.  Could the warnings effectively advise the suspect that he
8    > had a real choice about giving an admissible statement at that
   > juncture?" *Id.* at 611–12.

9

10 *United States v. Reyes-Bosque*, 596 F.3d 1017, 1031 (9th Cir. 2010).

11        The Ninth Circuit has interpreted *Seibert* to stand for the proposition "that where law

12 enforcement officers deliberately employ a two-step interrogation to obtain a confession and

13 where separations of time and circumstance and additional curative warnings are absent or fail to

14 apprise a reasonable person in the suspect's shoes of his rights, the trial court should suppress the

15 confession."  *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006).  *See also*

16 *Reyes-Bosque*, 596 F.3d at 1031.

17        However, defendant Jimenez's argument fails in this regard because, as discussed above,

18 Agent Adams' statement to him during their initial encounter did not constitute an interrogation

19 or the functional equivalent thereof under binding Ninth Circuit precedent.  *See Oregon v. Elstad*,

20 470 U.S. 298, 318 (1985); *United States v. Badalamenti*, No. 03:11–CR–0269–HZ, 2012 WL

21 5830393, at *5 (D. Or. Nov.16, 2012) ("Despite what Defendant may have perceived, there was

22 no two-step interrogation strategy because Findley did not interrogate Defendant . . . .  If there is

23 no deliberate two-step interrogation, then under *Elstad*, Defendant is capable of waiving his

24 *Miranda* rights if the prewarning statements were the result of uncoercive questioning.); *United*

25 *States v. King*, No. C 10–0455 WHA, 2010 WL 4226728, at *7 (N.D. Cal. Oct.21, 2010)

26 (suppression not required under *Seibert* and *Williams* where no two-step interrogation occurred).

27        Here, the parties do not dispute that Jimenez was later properly *Mirandized* before giving

28 his statement at the substation.  (Doc. No.48, at 1–2.)  Accordingly, because the first encounter

did not involve any questioning, interrogation or equivalent thereof, there was no impermissible piecemeal interrogation in violation of *Seibert*.

### 3. Jimenez's Standing to Challenge the Arrest of Co-Defendants

As noted at the outset, defendant Jimenez has joined in the motion to suppress filed by his co-defendants in which they argue that they were arrested without probable cause.  However, defendant Jimenez has failed to establish his standing to challenge the unlawful arrest of co-defendants.  In order for a defendant to have standing in such circumstances it is not sufficient that he "claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else"; rather, he "must have been a victim of a search or seizure." *Jones v. United States*, 362 U.S. 257, 261(1960), *abrogated on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980).  *See also Lyall v. City of Los Angeles*, 807 F.3d 1178, 1186 (9th Cir. 2015) ("In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else.") (quoting *Alderman v. United States*, 394 U.S. 165, 173 (1969)).

Here, Jimenez was not present at, and was no way involved in, the unlawful arrest of Flores, Juan Martinez-Tinoco, and Armando Martinez-Tinoco at the Pine Cove Inn.  Because he has no standing to challenge the allegedly unlawful arrest of his co-defendants, Jimenez's request to join in defendant Flores' motion to suppress is denied.

### III. Conclusion

For all of the reasons set forth above,

(1) Defendant Flores' motion to suppress evidence (Doc. Nos.  34, 35, and 36), joined in by defendant Juan Martinez-Tinoco and Armando Martinez-Tinoco (Doc. Nos. 37 and 38) is granted;

(2) The statements given by defendants Flores, Juan Martinez-Tinoco, and Armando Martinez-Tinoco on October 16, 2015 at the scene of their detention and arrest as well

as the results of the cell phone searches and the search of the hotel room are

suppressed as fruits of their unlawful arrest;

(3) Warden Shaw's identification of defendant Juan Martinez-Tinoco on October 16, 2015

is suppressed as fruits of an unlawful detention[11];

(4) Defendant Jimenez's request to join in defendant Flores' motion to suppress (Doc. No.

39) is denied;

(5) Defendant Jimenez's motion to suppress his statements made to law enforcement

officers (Doc. No. 39) is denied; and

(6)  This action shall remain scheduled for further status conference before the assigned

magistrate judge on September 26, 2016 at 1:00 p.m. (Doc. No. 64).

IT IS SO ORDERED.

Dated:   **August 5, 2016**                                  _____

UNITED STATES DISTRICT JUDGE

---

[11]  Although not addressed by the parties' in their briefs, an independent in-court identification of defendant Juan Martinez-Tinoco by Warden Shaw would appear to be admissible.  *See United States v. Crews*, 445 U.S. 463, 477 (1980).

26